IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2015 Session

## STATE OF TENNESSEE v. CHARLES DERRICK BELK

Appeal from the Circuit Court for Obion County
No. CC-13-CR-93     William B. Acree, Jr., Judge

No. W2014-00887-CCA-R3-CD  -  Filed May 13, 2015

The defendant, Charles Derrick Belk, was convicted by an Obion County Circuit Court jury of simple possession, a Class A misdemeanor; possession of marijuana with intent to sell or deliver, a Class E felony; Class C felony unlawful possession of a weapon; Class D felony unlawful possession of a weapon; and bringing a controlled substance into a penal institution, a Class C felony.  Following a sentencing hearing, the trial court imposed an effective twelve-year sentence as a persistent offender.  On appeal, the defendant argues that:  (1) evidence obtained pursuant to the search warrant should have been suppressed; and (2) the evidence is insufficient to sustain his conviction for bringing a controlled substance into a penal institution.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Joseph P. Atnip, District Public Defender (on appeal); and Harold E. Dorsey, Alamo, Tennessee (at trial), for the Defendant-Appellant, Charles Derrick Belk.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## FACTS

On April 26, 2013, officers executed a search warrant at the defendant's residence in Union City, Tennessee, as a result of which the defendant was indicted on a host of drug and weapon related offenses.

The defendant filed a motion to suppress the evidence obtained pursuant to the search warrant, arguing that the information the officer relied on to obtain the search warrant was based on hearsay. Specifically, he asserted that the officer relied on information given to him by a criminal informant who relied on hearsay from a third party, whose basis of knowledge was never verified. After hearing the testimony of the officer affiant and reviewing the matter, the trial court denied the motion to suppress, finding there was a sufficient basis of knowledge for the issuance of the search warrant.

At the defendant's trial, Officer Stan Haskins with the Union City Police Department testified that he assisted with the execution of the search warrant at issue in this case. Upon entering the residence, Officer Haskins saw an African-American male, identified as the co-defendant Michael Genes, in the hallway by the bathroom. Genes did not comply with Officer Haskins' order to get on the ground, and the officer had to physically subdue and handcuff Genes. Meanwhile, the defendant emerged from a bedroom next to the bathroom, and other officers placed him on the ground. After Officer Haskins had secured Genes, he noticed that the tank of the toilet was refilling. He secured the area and saw a torn plastic shopping bag containing a few smaller bags of marijuana beside the toilet.

Officer Derrick O'Dell with the Union City Police Department also assisted with the execution of the search warrant in this case. Officer O'Dell testified that he found crack cocaine on top of a plate that was sitting on cans of soup in a kitchen cabinet, as well as "wadded-up baggies" on top of the microwave. The cocaine was packaged in the corner of a plastic bag, tied off in a knot, and there was residue on the plate. He surmised that the amount of residue and how the cocaine appeared to have been chopped up indicated that it had been processed to sell. After photographing the evidence, Officer O'Dell contacted Investigator Palmer, the case agent, who collected the evidence.

Officer O'Dell testified that, in the defendant's bedroom, he photographed a gun, money in a shoe, and two bags of marijuana in the top drawer of a dresser. He also photographed personal paperwork belonging to the defendant and Genes, indicating that both men lived at the address, as well as three bags of marijuana inside a torn white bag on the bathroom floor by the toilet. He noted that the marijuana appeared to be packaged for resale, and each of the three bags contained approximately one ounce of marijuana. He also found a small amount of marijuana, enough for one marijuana cigarette, on Genes' dresser.

Officer Ben Yates of the Union City Police Department also assisted with the execution of the search warrant in this case. Officer Yates searched the defendant's bedroom, where he found money and two small bags of marijuana in the defendant's

dresser. He found a pistol containing a hollow-point bullet under the defendant's dresser. Officer Yates went to the Obion County Jail later that day. While there, Officer Yates heard the deputy jailer who was in a cell with the defendant yell for help. Officer Yates ran to the cell to find the deputy jailer holding the defendant away from the toilet, exclaiming that the defendant had thrown something into it. Officer Yates saw plastic bags in the toilet, so he put on latex gloves and pulled the bags out. He handed the bags to Officer Lovell, who had joined them in the cell. Officer Yates stated that, although he did not see the defendant get searched at the time of his arrest, it was the police department's policy to search arrestees before placing them in the patrol car. Officer Yates detailed the department's procedure for searching arrestees and surmised that the only way the defendant could have brought the marijuana into the jail would have been to hide it in his rectum.

Officer Jeff McBride, a correctional officer with the Obion County Sheriff's Department, assisted with the booking of the defendant when he was brought to the jail. Officer McBride patted down the defendant when he was first brought in, and the only area he did not check was the defendant's rectum. When the booking process was almost complete, the defendant asked to use the restroom. Officer McBride escorted the defendant to a holding cell that had a toilet and checked the cell to make sure there was no contraband in it. The defendant asked Officer McBride to leave him alone in the room, and the officer informed him that he could not leave the cell and to not flush the toilet. About that time, Officer McBride saw the defendant drop a couple of bags into the toilet. The officer moved between the defendant and the toilet and called for assistance. A nearby officer came into the cell and retrieved the bags from the toilet. Officer McBride said that it was not possible that the drugs found in the toilet had been deposited by another inmate because he checked the room and flushed the toilet before the defendant entered.

Officer Josh Lovell with the Union City Police Department also assisted with the execution of the search warrant in this case. He searched the defendant's bedroom with Officer Yates and found money hidden under the insole of a shoe in the defendant's closet. Officer Lovell transported the defendant and Genes to the jail after the search concluded. Prior to putting the defendant in the patrol car, Officer Lovell patted down the defendant, starting with the defendant's shoulder and working his way down, checking his waistline, pockets, and legs. At the jail, he saw Officer McBride pat down the defendant. Officer Lovell also witnessed Officer McBride escort the defendant to a cell to use the restroom and heard McBride yell that the defendant was trying to flush something. Officer Lovell responded to the cell and saw Officer Yates digging two bags of marijuana out of the toilet. Officer Yates handed the bags to Officer Lovell, who took them to be processed as evidence.

Officer Shawn Palmer obtained the search warrant to search the defendant's house. Officer Palmer took possession of the evidence found at the scene and either submitted it for testing or locked it up until the case was completed. He sent the crack cocaine found in the kitchen cabinet to the laboratory for testing. He took possession of and sent for testing three individually wrapped bags of marijuana from the bathroom, weighing a combined total of fifty-four grams, and two small bags of marijuana from a dresser drawer in the defendant's bedroom. Officer Palmer believed that the bags of marijuana found in the bathroom were packaged for resale.

Officer Palmer stated that $960 in cash was located in a shoe in the closet in the defendant's bedroom, and $400 in cash was found in a pocket of a pair of pants in Genes' closet. Officer Palmer also took possession of a .45 caliber Taurus semi-automatic handgun found in the defendant's bedroom. Officer Palmer collected the bag of crack cocaine from the plate in the kitchen and scraped the remaining crumbs of crack cocaine off the plate into another bag. They did not find any digital scales at the scene, but Officer Palmer said that drug dealers do not always use scales. Officer Palmer subpoenaed the defendant's bank records and learned that the defendant did not have an active account at one of the banks and owed money to the other bank.

Cory Needham, a licensed firearm dealer, testified that his business was broken into on August 6, 2012, and eleven handguns were stolen. The serial number for the gun found in the defendant's bedroom matched the serial number of one of the handguns stolen in the burglary. Needham acknowledged, however, that the gun could have changed hands several times between the burglary and when it was found in the defendant's possession.

Agent Brock Sain, a forensic scientist with the Tennessee Bureau of Investigation, testified that he analyzed the leafy green substance found in the bathroom of the defendant's residence and determined that it was marijuana in the weight of 54.44 grams. He also determined that the bags found in the defendant's dresser drawer contained marijuana weighing 6.78 grams, and the bag retrieved from the jail toilet contained marijuana weighing 1.65 grams. Agent Sain further determined that the substance found in the kitchen was cocaine base, weighing 3.06 grams.

Michael Genes, Jr., the co-defendant, testified that he had just cashed his check from his job at Williams Sausage and was in his room putting money in his pants when the police executed the search warrant on his residence. He confirmed that the $400 found on his person was also money that he had earned at his job. He said that he heard the police announce their presence, walked out of his bedroom into the hall, and was ordered to the floor. He denied that he tried to flush drugs down the toilet and was unaware that there was a plate of crack cocaine in the kitchen. He acknowledged

4

knowing that the defendant had used drugs in the past and claimed that the small amount of marijuana found in his room belonged to the defendant, who left it out on the ironing board after ironing his clothes.

Genes stated that he did not see any bags of marijuana on the floor in the bathroom the morning of the search. He said that he had just gotten home about fifteen minutes before the police arrived and that he did not use the bathroom during that time. He acknowledged that the defendant had a drug problem but claimed that the defendant did not use drugs inside their house. He had talked to the defendant about the need to stop using drugs. Genes said that the defendant had not been working since the prior October but had continued to pay his share of the bills. Genes claimed that he did not know how the defendant made money.

Following the conclusion of the proof, the jury convicted the defendant of simple possession, possession of marijuana with intent to sell or deliver, two counts (of different classes) of unlawful possession of a weapon, and bringing a controlled substance into a penal institution.

## ANALYSIS

### I. Search Warrant

On appeal, the defendant first argues that the trial court erred in denying his motion to suppress evidence obtained pursuant to the search warrant. The defendant relies on State v. Marian Rosenboro, No. 03-C-01-9203-CR-00080, 1993 WL 78746 (Tenn. Crim. App. Mar. 18, 1993), pet. reh'g denied (Tenn. June 18, 1993), in support of his argument that the confidential informant relied upon information provided by a third party, Jalissa McFall, who was not shown to meet the requirements of the Aguilar/Spinelli test. In addition, in his reply brief, the defendant also asserts for the first time that the affidavit did not establish "how long the nexus between the [defendant's] house and the sale would persist."[1]

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld

---

[1] Since this argument is raised for the first time on appeal, it is waived. State v. Johnson, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996).

unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Under both the Tennessee and United States Constitutions, no search warrant may be issued except upon probable cause, which has been defined as "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998). Tennessee requires a written and sworn affidavit, "containing allegations from which the magistrate can determine whether probable cause exists," as "an indispensable prerequisite to the issuance of a search warrant." Id. The affidavit must contain more than mere conclusory allegations on the part of the affiant. Id. However, a finding of probable cause made by an issuing magistrate is entitled to great deference. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999) (citing State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982), cert. denied, 459 U.S. 1137 (1983)). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993) (citation omitted).

In State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989), our supreme court adopted the two-pronged Aguilar-Spinelli test for determining whether an affidavit that relies upon allegations supplied by a criminal informant is sufficient to establish probable cause. Under the first, "basis of knowledge" prong of the test, "facts must be revealed which permit the magistrate to determine whether the informant had a basis for his information that a certain person had been, was or would be involved in criminal conduct or that evidence of crime would be found at a certain place." State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992). Under the second, or "veracity" prong of the test, "facts must be revealed which permit the magistrate to determine either the inherent credibility of the informant or the reliability of his information on the particular occasion." Id. (citation omitted).

Although lengthy, we deem it helpful to relay the contents of the affidavit in support of the search warrant in this case:

> During the recent weeks[,] Affiant has conducted an undercover operation purchasing crack cocaine in Union City, Obion County, Tennessee. During the course of this investigation[,] Affiant has used a criminal informant to purchase crack cocaine from Jalissa McFall. McFall resides at 110 Railroad Street, Union City, Obion County, Tennessee.

During the investigation[,] the criminal informant was provided with recorded funds to make crack cocaine purchases from Jalissa McFall. The criminal informant has purchased crack cocaine from McFall at her residence of 110 Railroad Street, Union City, Obion County, Tennessee on two separate occasions during this investigation.

The most recent crack cocaine purchase involving the criminal informant and McFall was conducted within the recent 72 hours of April 26, 2013. On this occasion[,] McFall instructed the criminal informant to drive McFall to a residence located at 610 East Florida Street, Union City, Obion County, Tennessee. McFall stated this residence was the residence of the "dopeman[.]" McFall indicated that the individual at this residence was McFall's source and supplier of the crack cocaine. The criminal informant dropped off McFall at which time the criminal informant observed McFall enter the residence of 610 East Florida, Union City, Obion County, Tennessee. A short time later[,] the criminal informant then observed McFall exit the residence and return back to the criminal informant. Before McFall left the criminal informant[,] McFall did not possess the crack cocaine that had been ordered by the criminal informant. However, when McFall returned from 610 East Florida, Union City, Obion County, Tennessee[,] McFall then conducted the crack cocaine purchase with the criminal informant for the specified amount that Affiant had the criminal informant place an order for.

The criminal informant then took McFall back to her residence of 110 Railroad Street, Union City, Obion County, Tennessee. The residence of Jalissa McFall . . . is a rental home. The utilities at this residence are not in the name of McFall but the actual home owner. Affiant therefore can not place any of utilities at the residence to Jalissa McFall. However[,] on two occasions in which the criminal informant purchased [c]rack cocaine from Mc[F]all[,] it was at this residence. McFall has stated to the criminal informant that this residence is McFall's home. Affiant has observed McFall coming and going from this residence.

The criminal informant then met with Affiant and gave Affiant the crack cocaine that had been purchased from McFall. Affiant did conduct a field test of the substance. The field test kit did indicate the substance to be positive for cocaine. The criminal informant had described the location in which McFall had retrieved the crack cocaine both during the transaction in which Affiant was electronically monitoring and once again after the crack cocaine purchase was conducted. The criminal informant rode with Affiant

7

to the 610 East Florida address and did physically point out the exact residence in which McFall retrieved the crack cocaine that was sold to the criminal informant by McFall. The exact address in which the criminal informant identified as the address in which Mc[F]all retrieved the crack cocaine was that of 610 East Florida Street, Union City, Obion County, Tennessee. Affiant has also confirmed that the residence of 610 East Florida[,] Union City, Obion County, Tennessee has utilities in the name of [the defendant]. The water utility was turned on at this address by [the defendant] on October 5, 2012 . . . .

Affiant has worked with this criminal informant on other non related cases on several occasions. This criminal informant has conducted three other purchases of narcotics from three other individuals not involved in this case. On each occasion the criminal informant has been provided recorded funds to make the narcotic purchases. Affiant has conducted surveillance during each of these narcotic purchases both by human surveillance and electric surveillance. Affiant has given the criminal informant instructions on what narcotics to buy and the weights the criminal informant is to purchase. On each occasion the criminal informant has conducted the purchases as instructed and has purchased the specified narcotic and the amount in which Affiant instructed the criminal informant to purchase. This criminal informant has also giv[en] information that has led to the seizure of further evidence in another case. This criminal informant's information led to the seizure of marijuana shipped via the United States Postal Office from California to an address in Union City, Obion County, Tennessee. Due to this information the narcotics were seized and two arrest[s] were made as a direct result of the criminal informant's information. This criminal informant is also still working with Affiant in other ongoing narcotic investigations.

Affiant is familiar with Jalissa McFall. Affiant has personally spoken with McFall. Affiant has also received information from other officers in the past concerning Jalissa McFall selling illegal narcotics. Affiant has checked the criminal history of Jalissa McFall. Jalissa McFall has one conviction in the Obion County, Tennessee[,] General Sessions [C]ourt for simple possession of SCH VI on February 23, 2012.

Affiant is also familiar with [the defendant]. Affiant has received information in the past concerning [the defendant] selling illegal narcotics. Affiant has checked the criminal history of [the defendant] and ha[s] found

where [the defendant] received a conviction for a SCH[] II cocaine offense in the Obion County Circuit Court on January 24, 1996.

Based upon Affiant's investigation[,] Affiant does believe there is probable cause to believe that Jalissa McFall is operating an ongoing criminal enterprise and conspiracy to sell and distribute cocaine in Union City, Obion County, Tennessee. Furthermore[,] Affiant does believe that probable cause exist[s] that the resident of 610 East Florida Street, Union City, Obion County, Tennessee[,] is a part of Jalissa McFall's on going criminal enterprise and a coconspirator in the sale and distribution of cocaine contrary to the State Laws of Tennessee.

Based upon the described facts outlined in attachment A of this search warrant and affidavit and all facts here in, Affiant does believe that Jalissa McFall and [the defendant] do posses[s] the documents and items listed to be searched for as outlined in Attachment B and that these items and documents are being used to continue an on going criminal enterprise to distribute, transport and sell illegal narcotics.

The evidence showed that the confidential informant had purchased cocaine from McFall on several occasions, and on this particular occasion, McFall did not have enough to sell, so she and the confidential informant went to her supplier's residence. McFall entered the residence and emerged with cocaine, which she immediately sold to the confidential informant.

In denying the defendant's motion to suppress, the trial court found:

The confidential informant went with McFall to the, quote, "dope man's," end quote, house to buy drugs. The confidential informant gave McFall money to buy the drugs. She went into the defendants' house. She came back out of the house without the money and with cocaine. This was given to the – eventually to Officer Palmer. All this was overheard by Officer Palmer who thus was able to corroborate what had happened.

The Court finds there is sufficient basis of knowledge for the issuance of the search warrant in the case.

As we understand the slender recitation of facts in <u>Marian Rosenboro</u>, upon which the defendant relies in his complaint about the affidavit, the search warrant affidavit stated that "[w]hile at the residence [which later was the subject of the search warrant,] the confidential informant, via the unwitting informant, purchased a quantity of cocaine

from an unknown black female resident of the home." 1993 WL 78746, at *1. As we will explain, we do not find Marian Rosenboro relevant to this matter.

According to the affidavit in the present case, the confidential informant had made previous purchases from Jalissa McFall at her residence. Within seventy-two hours of the execution of the search warrant, McFall had instructed the informant to drive her to the location which later was the subject of the search warrant, saying that this was the residence of the "dopeman," who was her "source and supplier of crack cocaine." The informant observed McFall enter the residence and, a "short time later," return to his vehicle. Upon entering the residence, she did not possess crack cocaine, but she did so, and in the amount sought by the informant, when she returned to his car. The informant then met with the affiant and gave him the crack cocaine he had purchased from McFall.

In the present appeal, the affidavit set out in detail the affiant's prior dealings with the informant, which had led to the purchase and seizure of narcotics on multiple occasions, as well as the arrests of two individuals. Further, the affidavit explained the informant's dealings with Jalissa McFall and his obtaining crack cocaine, as well as information officers had regarding prior sales of illegal drugs by McFall and the defendant, as well as the defendant's previous conviction regarding cocaine. In Marian Rosenboro, the affidavit had no corroboration for the "unwitting informant's" claim that he or she had purchased the drugs in the house to be searched. In the present appeal, by contrast, corroborating information was abundant.

In light of the deferential standard of review on appeal attendant to the magistrate's decision, we conclude that the facts contained in the application for the search warrant established a substantial basis on which the magistrate could conclude that the informant had a basis for his information that evidence of the defendant's drug trafficking would be found inside the defendant's residence and that the informant's information on this particular occasion was reliable. Moreover, we conclude that the affidavit contains a sufficient nexus of time between the criminal activity and issuance of the warrant.

## II. Sufficiency of the Evidence

The defendant argues that, in the event this court upholds the validity of the search warrant and his conviction for bringing a controlled substance into a penal institution is therefore not considered fruit of the poisonous tree, the evidence is insufficient to sustain his conviction for bringing a controlled substance into a penal institution. He asserts that he did not bring the drugs into the jail with "unlawful intent" and that "there is no difference in the measure of evil in [the defendant]'s mind from someone who dumps

drugs in the squad car. [The defendant] just had the bad luck to have had no access to the drugs before he got to the jail."

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A conviction for introduction of contraband into a penal institution requires that a defendant "[k]nowingly and with unlawful intent take, send or otherwise cause to be taken into any penal institution where prisoners are quartered or under custodial supervision any weapons, ammunition, explosives, intoxicants, legend drugs, or any controlled substances[.]" Tenn. Code Ann. § 39-16-201(b)(1).

The evidence shows that when the police entered the defendant's home to execute a search warrant, the defendant emerged from a bedroom and was placed on the ground. Prior to putting the defendant in the patrol car to take him to jail, Officer Lovell patted down the defendant, starting with the defendant's shoulders and working his way down, checking his waistline, pockets, and legs. At the jail, the defendant was searched again, this time by Officer McBride. The only area Officer McBride did not check was the defendant's rectum. The defendant then asked to use the restroom, and Officer McBride escorted him to a holding cell with a toilet. The defendant asked Officer McBride to leave him alone in the room, and the officer informed him that he could not leave the cell and to not flush the toilet. The defendant then proceeded to drop a couple of bags into the toilet. The officer moved between the defendant and the toilet and called for assistance. Officer Yates was nearby and came into the cell and retrieved the bags from the toilet. Officer McBride said that it was not possible that the drugs found in the toilet had been deposited by another inmate because he checked the room and flushed the toilet before the defendant entered. The defendant does not deny that he secreted drugs in his underwear.

In the light most favorable to the State, the proof established that the defendant hid marijuana in his underwear or rectum, successfully secreting the drugs during two searches by police. He knowingly and with unlawful intent brought the drugs into the jail, where he intended to dispose of them to avoid incurring charges relative to possessing the drugs. The defendant characterizes his getting caught attempting to flush the drugs as "bad luck," but the evidence supports that the only bad luck he experienced was that he was caught attempting to flush them. The evidence is sufficient for a rational trier of fact to find that the defendant, knowingly and with unlawful intent, brought a controlled substance into a penal institution.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE